Mr. Lieberman? Yes. Good to have you, sir. Nice to be here, Your Honor. May it please the Court, Jeremy Lieberman on behalf of Appellants. Your Honor, we think the complaint as pled was actually quite simple in theory and really in allegations. The core allegation of the complaint was that come 2009, trans 1 in the Axialift procedure was given a Category 3 designation by the American Medical Association. That Category 3 designation meant that the procedure was experimental. And that designation is immutable. There is no wiggle room. Once you get that designation by the AMA, there is only one way that that procedure can be billed in reimbursement forms to either Medicare or to any other insurance company. It has to be billed as a Category 3 procedure. There's two possible codes you can put in, 0195T or 0196T. It depends if you're doing a one-vertebrae or two-vertebraes in your fusion. And so that's really what had to be done. Any veering So why couldn't they break it up into multiple parts the way they did? Well, that's actually a misconception that the District Court put upon it. The issue is not that they broke apart multiple parts. Every surgery has multiple parts to it. The issue is when you categorize the fusion itself, you have to either call it a Category 3 or you call it an anterior or a posterior procedure. Those are the choices. There isn't an option of multiple parts. That's something that the District Court grabbed upon by a statement by the company saying that when we do procedure, to capture the entire procedure, there's about 10 different codes you can put in. That's true. When you start the procedure, when you open up the body, when you do various things, there's always various billions and codes you put in. When you make the fusion itself, though, you have to designate it one way. It's either an anterior procedure, a posterior, or it was designated as Category 3, as experimental. Those are the options. That's pled very, we believe, very clearly in the complaint. That was the only, when it comes to describing the axial lift procedure, there's only one way to do it, 0195T or 0196T. That was it. Anything else, you want to call it anterior, posterior, or experimental, or miscellaneous, which is what the Trans1 advocated, you are violating the False Claims Act. What the District Court grabbed upon when the company made a statement saying we use many codes to capture the entire procedure, that's any procedure, any surgery in the world will have multiple codes to capture every part of a procedure. There's only one designation for the axial lift. It's either experimental, posterior, or anterior, or it can be called miscellaneous. Once the AMA tells you it's submit, that in the complaint it's pled as such, in the Cuitamotion, which the District Court had taken as a, on judicial notice, that is pled very clearly. There's only one way to do this. It's got to be, it's got to be a experimental Category 3 procedure. What was clear was that defendants, and that's throughout the allegation and complaint, defendants consistently. So what's the best paragraph or two in your complaint that's, that pleads what you just in the Cuitamotion as well. In the Cuitam? Cuitam, yeah, yeah, in the Cuitamotion, yes. The Cuitam allegations of this complaint or the Cuitam complaint? Well, they were incorporated, the court accepted judicial notice. Oh, the Cuitam, I know, but what, is it, is it in this complaint, or are you referring back to the Cuitam complaint? Well, on paragraphs 29 and 30, it discusses the designations in the complaint, and then the Cuitam. Well, where does it plead in those two paragraphs that the, what were they? Trans 1 and all the individual defendants represented that you could do multiple steps and that the multiple steps were violative of the False Claims Act. Where's that? I don't think they ever raised any question that they got this Category 3 designation and that they, you know, published information about that. Okay. Paragraph 47 of the Cuitam complaint. 47? Of the Cuitam, yeah. Now, is that 47 of your complaint? The Cuitam, which was accepted by the district court. Of the Cuitam complaint. The Cuitam, yeah. You actually incorporated it by reference, did you? We did, and the court accepted the, took judicial notice of the Cuitam complaint. So I'll read it very clearly. Did you file a Cuitam complaint in this record? Yeah, we did, and it was in the request for judicial notice. But I'll read paragraph 47. Defendant Axeliff's system was assigned the Category 3 CPT billing code, which became effective January 1, 2009. Defendant was and continues to be required to bill the Axeliff system only as a CPT billing code 0195T and 0196T. That's it. Only. There's only one way to bill for this. And that's in the complaint. It's also alleged in the complaint. I just can't, on the cuff, find it precisely. But that's the thrust of the Cuitam complaint. Now, how did you incorporate the Cuitam complaint into your complaint? We made a, when the Cuitam, we made a request for judicial notice with the court, and the court allowed that. Allowed you to file the complaint, or allowed you to amend your complaint to include that? We included it, and also, allegations of the Cuitam complaint are referenced in our complaint. That's in paragraphs 39 through 46. And in addition, we made a request for judicial notice with respect to the Cuitam complaint, which was allowed by the district court. So I don't think there could be any question whether or not the Cuitam complaint is in the record. If there is any defect in the way we did that, we certainly would request leave to amend to put it in the record. But the Cuitam proceedings conducted in the Eastern District, North Carolina? It was the United States District Court for the District of Maryland. In Maryland? Yeah. Okay. And so that's, I think that is a critical mistake and error that the court made, was to say, well, there was multiple ways to do this, or we could do this in steps. That just simply wasn't the case here. You had to designate it as a Category 3. If there's any defect in the way we've pled that, or the way we've put that in the record, certainly we request leave to amend. But that is the core and building block of this complaint. And so the reference by the company to multiple codes, that is true in any procedure. That's true in the world. You're going to have various stages to a procedure, and you've got to get reimbursement. How about talk about cyanide and loss causation? Sure. That's pretty important to you. Well, when it comes to, so once, if it is true, as we allege, we think very specifically, that it's illegal to submit a claim that is not a Category 3 claim, then in context, defendant's actions take the proper context. Defendants consistently had a program whereby Axi-Lift is its only source of revenue, and where they consistently pushed that surgeons should bill this as an anterior or posterior procedure, which is a different code. It's a 22899 code or 22558 code. And that was consistently through instructions to salespeople, instructions to distributors, at seminars where they would show how the Axi-Lift procedure is done. So what paragraph or paragraphs in the complaint allege that these individual defendants at Trans 1 did this multiple coding thing, and that that in and of itself violates the False Claims Act, and they knew that it violated the False Claims Act? What's your best paragraph for that? Well, it would be that we don't have a paragraph saying the individual defendants specifically directed this scheme. It was something that was throughout the company. This was a core of practice, and the inference would be then is how the individual defendants who know the importance of the Category 3 designation know how reimbursement is in multiple statements. All right. Well, let's phrase it another way. What's your best paragraph that alleges C enter? One example, and this is amongst many, is paragraph 64. 64? Yes, where Defendant Randall is present at a meeting whereby it is instructed the distributors at the national meeting to use an anterior designation, to use it non-Category 3. But it's really that's And you say that's what paragraph 64 says? Well, 64 says that Defendant Randall attended the meetings whereby they instructed Well, how does that show C enter? Well, Your Honor, it's really C enter is, and if the court doesn't buy it, then doesn't buy it. C enter is that the company has engaged in a pervasive course of conduct where this And C enter doesn't require that there's common sense C enter, which is really in the core operations doctrine. C enter doesn't require that you're going to get an email from the individual defendants to a distributor saying use anterior posture here. It's a the company has an entire course of conduct whereby it raises revenues, and the only way it can stay in business was to violate the MAA's directives. And the question is how would they not know? How would they not know in the reimbursement guide that they're directing people to use a non-Category 3 direction and designation? How would they know when their main surgeon who performed seminars and how to bill and how to do the accidently program, how do they not know that he was telling people to bill this as an anterior procedure and not the Category 3 designation? This wasn't just some small, you know, a few million dollars of revenue for the company. This was the company's main product. And if the company didn't do this, it simply would have gone out of business. This was a threat across the entire bow of the company. And so it's really a core operations doctrine. I understand that, but this is just not your garden variety civil claim because you're not only under 9B specific pleading requirements, you're also under the heightened requirements of the PLSRA. And saying that an officer of the company was in the same city and went to this meeting seems to me somewhat attenuated for CNR purposes. Your Honor, we respectfully stated that the endorsed by many circuits is the core operations doctrine. And the core operations doctrine is when something goes, when a matter goes to the core operations of the company and company executives profess knowledge as to the issue, it's simply absurd, which is the quote from the circuit courts, to suggest that they didn't know. It is absurd to suggest that such an important issue as to now you're losing your source of revenue and you don't know how you're making your money, that there's a pervasive scheme to defraud the government to violate the False Claims Act, and you wouldn't know. Now, if there's one instance, one surgery, I'd agree, Your Honor. I'd agree that that inference wouldn't exist. But this is pervasive throughout the company. Confidential witness after confidential witness, the quitam complaints, everything suggests this was a company-wide policy. And this was, it went up to Ms. Connors, Amy Connors, who was the head of reimbursement. It was her directive to tell people, bill this, code this as an anterior procedure. Rick Simmons, the head of sales, he also instructed people to use this as an anterior procedure. What's the significance of the quitam settlement? It goes to the size and depth and also, we would say as well, the veracity of the claims against the company. The district court judge said, well, they didn't admit to liability. They often don't, Your Honor. Within 14 months of the onset of the investigation, the company ratcheted down and settled this for $6 million, which was 28% of the company's cash available. Ultimately, this company goes bankrupt because they couldn't sustain their company without violating the False Claims Act. And so it would suggest, it is not the only inference to enter, but when you do have a veracity to the allegations, which are only confirmed by the confidential witnesses. And so it would be, Your Honor, if the court doesn't buy that if you have a scenario where there is widespread company-wide policy to violate the False Claims Act, that the individual defendants wouldn't be under the co-operations doctrine, wouldn't be found liable, then I would admit on the record, we don't succeed. It has to be that this court has to accept that when you have such a widespread witness and the reimbursement guys, when it's at seminars funded by the company, by Dr. Tobler, where he was there, and he would tell people, this is how you bill it, as an anterior. If the court doesn't accept that this widespread scheme is insufficient to create an inference to center, then we do fail. We do think, though, that the overwhelming rate, based on Taleb's approach, based on the various circuits that have endorsed the co-operations doctrine, that it clearly is in the ambit of that doctrine that it is absurd to suggest that defendants didn't know how they were making their money. This is their only product. And they can't get reimbursed for the product if they don't get – if they don't go away from the Category 3. They won't get a dime. And so the only way these guys can make money is to tell people, bill this as an anterior procedure. If that basic function is – Let us see what they say about it. By all means, Your Honor. All right. I hope you'll address lost causation when you get back up. Oh, sure. Absolutely. You were asked about that by Judge Floyd. You want him to answer it now? Well, I want him to look it up. Mr. Rahm? May it please the Court, Steve Rahm for Appealese. And I'm joined with my colleague, Aaron Humes, who will address the issues across the field of lost causation. For the Securities Act here, to have a securities law violation under Section 10, the Omnicare case we cited from the Sixth Circuit is particularly appropriate here, and the District Court relied upon that case. In the context of their allegation that you're alleging noncompliance with another law, the Court said you need to look at what statements are made by the company. Does the company make a factually-based statement saying you have a specific program that complies with a specific law? And second to that, the Omnicare case noted that also look to whether or not the defendants have contemporaneous knowledge that the company is actually in violation of the law that they're proclaiming to go ahead and be in compliance of. The problem with the complaint here that has pled, and even if they were to consider any to amend here, is the issue that there is no statement the company ever made during the class period that said we comply with any particular law, and definitely no statement that's based on facts. Instead, the company disclosed the risk imposed by the False Claims Act and other health care laws. It disclosed its attempt to comply with those, but it also disclosed there were very real risks to even their attempt to comply because many of those laws had not been interpreted by regulatory bodies or the Court. So, whatever they were, that risk was heightened. That's disclosed here, and that's what prevents there from ever being, even if there was supposedly a violation of the False Claims Act, it does not translate into a violation of Section 10. Beyond that... You mean not necessarily? Well, not necessarily because there needs to be a public statement that investors can rely upon. That's false. But it could be evidence. Excuse me? It could be evidence. But the... But the... But the False Claims... The KTOB proceedings are relevant. Yes, Your Honor. Okay. But the... Whether or not there's a false statement, the very first element of Section 10 is what statement did the company make? Was there an obligation to disclose something more? And without that hook, there is no Securities Act, or no Exchange Act claim. There's no duty to speak on an issue. There is no duty to protect the legality of a company's practices, and there's no duty to generally report a company's violations of the law, usually. That's where the Omnicorp case is particularly important to looking at how, in a situation like this where you're saying there's a violation of some other law, what's the requirements there? And we submit that the allegations don't support the element of falsity. They also don't support that there's any time, as the Court's questions to counsel, that any of the individual appealees had knowledge of these supposed violations that were going on. I think the... Your opposing counsel says that, by including these allegations from the KTAM complaint at paragraphs 39 to 46, that he has... in that, within these paragraphs, that using any code other than the Category 3 code is a violation of the False Claims Act, and that your clients knew it. So what's your response to that? Well, I think it's twofold, Your Honor, and I think the first part is the company disclosed that the product, Ask Aleep, had a Category 3 code effective January 1, 2009, and at that product is used, the Category 3 code is appropriate. There's no doubt about that the company disclosed that. Even their own allegations to the complaint make clear the reimbursement guide, for instance, they point to in the complaint, states that the Category 3 code is appropriate. Now the issue about multiple coding is slightly different. The idea of multiple coding is that there are multiple processes during the totality of a spinal fusion procedure, and so the surgeon is going to go and code for each of those little portions of that. One portion is going to be the Ask Aleep product. That has to get the Category 3 designation. The company disclosed that's what it did. That's in their complaint, in paragraphs 71 and 74, the company disclosed that we believe multiple codes are appropriate, not for the Ask Aleep product itself, but for the totality of the spinal fusion procedure. So what else are they doing that they code differently? Is that anesthesia? It's everything from opening the initial incisions to open the person up, anesthesia, all this sort of preliminary work, and sort of post-op work as well. So there are multiple codes that would be multiple portions of a larger spinal fusion procedure. And I think as the District Court noted in its decision, there's no allegation that using the multiple codes violates the False Claims Act. Not even in the QI-TAM settlement does the government make an averment that using multiple codes in the way the company described it publicly in 71 and 74 of the complaint that's alleged showed that that would ever violate the False Claims Act. In addition, speaking to Seantor, there is no allegation, and they point to the one allegation, paragraph 64 of the complaint, this national meeting that Mr. Randall attended. First of all, I'd like to point out that that's the only allegation as to any of the individuals. So when the three other individuals here, there's no specific allegation as to them, that undercuts any possible inference of Seantor as to the entirety of them. 64 in particular, this is a national sales meeting that takes place as basically a distribution meeting and so Mr. Randall attends at some point during that meeting, but at no point in time does their allegation tie him to being present when supposedly some statement is made that the physician should absolutely ignore the Category 3 designation and use some other code. That Confidential Witness Number 5 doesn't state anything remotely close to placing him at a meeting at that point in time. And this is a fraud case subject to the PSLRA and that unfortunately the complaint here lacks the particularized allegations. In addition, if you look at just the other allegations that counsel talked about the core operations doctrine, but this court addressed that already in Yates. Yes, a senior executive and something that involves a particularly important product line, you do presume that they're going to know something about that product line generally, but you don't presume they have Seantor for the Exchange Act purposes. And then instead of courts, for Seantor purposes, instead you need to look at are there red flags that would make someone aware of a practice that's going on. Is there a report to the board? Is there a statement? Is there a meeting? Is there some sort of sales? The allegation with respect to these confidential witnesses is pretty compelling, talking about conjuring up schemes to avoid the Category 3 classification. Well, Your Honor, I would disagree and that's because these confidential witnesses, none of them even mention being in the same room with any of the directors or the individuals or having any meaningful conversations. Alleging a scheme to get around the Category 3 and that apparently underlies the Key Tom complaint, and does underlie the Key Tom complaint, which was settled for an amazing amount of money in a very short time, are false claims against the government. Well, Your Honor, I would disagree with it. The Key Tom settlement is $66 million. I think that's not very much. I think in the grand schemes of what was the company... What do you say was 28% of the... Of cash on hand at one given moment in time. Of the cash on hand. The Key Tom complaint was also paid over time, that settlement. In addition, it's over, it's 20 months later approximately after the investigation began to the settlement, so I don't think this... In your 10-K, in your 10-Q and 10-K filings, didn't you make statements in there about you're trying to get this Category 1 to be approved, and in the meantime, we don't think our revenue will be impacted, et cetera, when in fact it was going to be because you couldn't get the Category 1 assignment? Yes, Your Honor. First of all, respectfully, with respect to that, I guess that's a forward-looking statement of a projection of what the company thought the impact might have. This is also a start-up company for the most part as well, so it's difficult for them to go ahead and make projections. I don't think that they make an allegation or a complaint about whether or not that statement, the projections they made, was false or misleading. The company was, and disclosed, and eventually achieved a Category 1 designation after the class period ended, and that was part of their public strategy, and that's one of the competing inferences here for SEANTRA purposes as well. The company had these processes in place, and also working with individual carriers while the Category 3 designation, and Humana, the insurance carrier, agreed that we would still cover a active life procedure, even though it's got a Category 3 designation, because it is less evasive, and the company did a good job of educating Humana about that and others, and so that's one of the additional competing inferences the Court had to consider. This is a very sort of complex area, coding and these regulations. It's very similar to the Court's decision in Yates, where there are accounting issues that that... How does Humana's stuff get in the record? It's in the complaint. It's part of the excerpt from one of the 10 cases. So they allege what you just said? They excerpt... What alleges what you just said? That's correct. They excerpt a very long paragraph, and in that paragraph is the statement that Humana agreed to cover the active life procedure. In addition, just on SEANTR briefly, they mentioned stock sales in their brief. It's important to also note, there's really no motive here, though. Stock sales for one individual sold 18 percent, roughly, of his holdings. Three of the other ones had no stock sales. One of them actually increased his holdings of company stock. All of that weighs against any inference of SEANTR here. Well, this guy, Randall, who made certain statements publicly about the controversy surrounding Code 3, Category 3, actually in May of 2010, he disposed of 100,000 shares of his stock, and another 20,000 in August of 2011. Isn't that a little bit of a sign of a sinking ship? I don't think so, necessarily, Your Honor. He sold 100,000 in May of 2010, and notably that came after the company released negative information, earnings release, and the company's stock had fallen about $1.50 at that point in time. So, he wasn't, if he was trying to go ahead and profit off sort of this theory of inflated stock price, he definitely wasn't timing the market to do so. And I think the way against Randall's sales, one individual's sales, roughly 18 percent of his entire holdings, compared to when you have the three others who don't sell any stock and one who actually increases or almost triples his stock holdings at the company, they definitely didn't have the same, there's no motive for them to go ahead and do this. To the extent there is some assertion that the motive here is about, I believe I'm on the red here. I'm sorry. Pardon? I believe I've lost. Your Honor, you're a couple minutes over, but we're, I'm pretty loose on this kind of stuff. I don't want to cut you off. But you bet Mr. Humes got some time too here. Yes, yes he does. So, unless the Court has any further questions, I'll defer to Mr. Humes. Thank you very much. Thank you. Mr. Humes? Good morning, Your Honors. May it please the Court. My name is Aaron Humes. I'm here on behalf of the appellees and the cross-appellants. You've heard my colleague discuss that... What's the difference between what he argued and what you argued? I'm going to address the issue of loss causation only. You're the loss guy. I'm the loss causation guy. All right. Judge Floyd has been waiting for you. Okay. And so our argument is that this is an additional independent basis to affirm the judgment below. The plaintiff does not adequately allege loss causation. So what is loss causation? Loss causation is a requirement... And you lost on this in the District Court. Initially, we had moved to dismiss the first minute complaint. We won solely on this issue. The Court didn't get to a falsity of signature. Plaintiff filed a motion for reconsideration, and the Court decided to change its mind. So you lost. Correct. And so we filed... That was an interlocutory order. And so once there was a final judgment, we filed the cross-appeal as to that issue. So loss causation requires the plaintiff to allege that there was misrepresentation that proximately caused the plaintiff's loss. And the rationale is that the federal securities laws are not here to provide broad market insurance against any type of loss. It's only loss related to fraud. And this Court requires that loss causation be applied with a sufficient specificity, which is akin to Rule 9. And it's a fact-dependent inquiry, and the Court looks to the totality of the circumstances. Here plaintiff alleges that he's alleged loss causation under two theories, both a corrective disclosure theory and a materialization of a concealed risk theory. So what are these things? A corrective disclosure is basically a company that files a public document saying, you know, our prior 10K was incorrect, the numbers are inaccurate. You can no longer rely upon it, i.e. a restatement. That's a quintessential type of corrective disclosure. Materialization of a concealed risk is basically this idea of, instead of filing a direct document, maybe there's just news out in the world that comes to light that contradicts a prior statement. And a good example of that is the Henry Massey energy case, where Massey said, hey, we're a great mining company. We have a very safe record. Our mines are safe. Well, then one of their mines explodes and 29 workers are killed. That event in the real world contradicts directly their statement about the safety of their mines. So those are the two types of theories. Plaintiff, in this case, points to three events. That was a criminal prosecution. Right. And there was a related securities action as well. There was a prosecution, part of the prosecution related to that. And I think there were congressional findings, there were news reports, there were revelations of past violations of safety codes. None of that, of course, is here. So in this case, plaintiff points to three disclosures slash events that plaintiff thinks is relevant to the law's causation. Plaintiff points to the company's announcement on October 17th of 2011 that it received a subpoena from the Department of Health and Human Services. Plaintiff also points to a day later, on October 18th, an analyst apparently issued a report. We don't see the report in the complaint, only an excerpt where the analyst speculates as to what the subpoena might be about. And then plaintiff points to 20 months later, the settlement of that subpoena slash government investigation and the related Ketam complaint. The problem for plaintiff is none of those three events reveal this widespread fraud to plaintiff that thinks he's adequately alleged. The subpoena just simply announces an investigation, the beginning of an investigation. There's no finding there. There's no preliminary findings there. It's just the receipt of a subpoena. The analyst reported... Subpoena issued by the Department of... Health and Human Services, in particular the OIG that sits inside... There was a settlement of the Ketam proceedings. Is there any indication that there's a connection between the two? Yes, well, plaintiff alleges that... They allege... That's the... They allege that in the complaint. In the complaint, plaintiff does allege that the subpoena, the government investigation was prompted by... The Ketam complaint altogether? By the sealed Ketam complaint. Which occurred... But it's unsealed now, isn't it? It's unsealed now, but at the time it was sealed, and I think that was filed... It was sealed back then. It's unsealed now. Correct. Unsealed July 1st, 2013. Right. Well after the cross-period. Right. So, in the analyst's report, which plaintiff excerpts, it does not include the full copy, and I was unable to find, otherwise I would have included it in the JA. The analyst simply speculates, even uses the word, we are speculating basically, that maybe this is... The subpoena is prompted by a disgruntled employee, or maybe it has to do with reimbursement communications. There's no revelation of any truth there. It's just a guess. And then the settlement, the settlement, which we've included in the JA, it's without any omission of liability. The company expressed... That's what they all are. Those key comp settlements, I think. That's the ones I've seen. They never... That's part of the settlement. I suppose, but in this particular case... They make people settle about every lawsuit. Sure. They're not admitting anything. They just want to get it over with. I think the SEC changed its position on this idea of no omission settlements, because they received a lot of fallout from the early financial crisis and the lack of prosecutions, and so now they do want omission. So I think you are starting to see that, and maybe there are instances in the past as well. But that settlement, 20 months later... 20 months later from what? From the stock drop on October 17th. So well outside the class, but plaintiff basically alleges, well, the market of course knew on October 17th what happened 20 months later. And in our view, that's fraud by hindsight, and that's improper. How could the market have known all that? On October 17th. And the settlement, we expressly denied all the allegations without omission of liability, and we said we want to settle this because of the time and cost of having to deal with protracted litigation. So we don't think there's a corrective disclosure here that satisfied that position. The government agreed that you put that kind of a statement into the settlement. That's right. It's in there. Right. The government agreed to that with you. The government agreed. And if it's such a slam dunk case, as plaintiff kind of makes it out to be, why did the government settle? The government's not a party here. They're not a party here. So we don't think there's a corrective disclosure theory of loss causation, and for many of the same reasons, we don't think there's a materialization of a concealed risk theory. Think about the label, materialization of a concealed risk. What was concealed here? We disclosed the coding change. We disclosed our reimbursement practices. We disclosed that we thought you could do multiple coding for the entire procedure. We disclosed that we thought these laws, these false claims act laws, were complex and not fully interpretable. When you settled that Keatom case with the government, did they agree not to prosecute anybody? I think... Not further pursue anything like that? I have not seen any further prosecution from anyone, and the only person or the only entity named in the Keatom complaint is the company. The individual defendants are not there. So we don't think this is a materialization of the concealed risk either, for the similar reasons that we disclosed the risk, that there could be a subpoena, there could be fines, and we just don't think there's that strong connection like there was in Re-Massie, where you have a mine explosion that directly calls into question, in a really substantive way, your statements about safety. I mean, here, plaintiff alleges at best that we said we attempt to comply. Not that we do comply, that we're always in compliance, and we talk about how these laws are complex. So we just don't think an announcement of a subpoena, followed by no admission settlement, and speculation from an analyst amounts, either singularly or collectively, into loss causation. You have about, you've used up about three and a half extra minutes. You saved some time. So you've got another, you've got some more time. Thank you, Your Honor. Why don't we go back to Mr. Lieberman, give him another shot at it. Thank you, Your Honor, and I do owe an answer on loss causation. The loss causation events are primarily the October 16th disclosure of the subpoena by the DHHS. And so, the question always is, well, what's the revelation of the fraud? It's quite apparent, from the analyst report we cite in the next paragraph, in paragraph 109, that the market quickly grasped exactly what was at issue. They straight out said that this probably stems from allegations by a disgruntled former employee, and another speculation they say would be since about half of Trans 1's revenues come from physicians still using the ALIF code rather than the designated T code. This is the first time the market learns, wow, they're using the ALIF code and not the designated T code. And so, this is, the market is apprehending. We've got a real problem. The problem here is precisely, they couldn't have been more on the ball with knowing what the problem was. They knew this was ALIF. They knew this was probably a disgruntled employee, a KETAM, and they're able to figure it out. What happens to, then, what happens, and this is the same story goes on in almost every regulatory action case. Two months later, it all comes out. There's a settlement. There's further allegations. The stock doesn't move 20 months later because the market already apprehended on the first day with astounding precision exactly what was at issue. And so, that is a loss causation allegation here. This issue has been taken up by the Fifth Circuit and Ninth Circuit regarding whether or not the announcement of investigation is sufficient to allege loss causation. The consensus amongst these circuits and the Second Circuit as well has opined on this is that the announcement of investigation alone isn't sufficient. When that investigation, though, announcement is buttressed by allegations of fraud that confirmation via regulatory matters or other, or by analysts who, here, precisely understood what the issue was, that does rise to loss causation. It's very seldom you're going to get a company to say straight out, we've committed fraud, and then that's going to be an allegation of loss causation. The primary textbook example is something like this. There's announcement of investigation. The market figures it out. These are very savvy analysts who are in the healthcare industry, and they're constantly false claims act is a key issue, and they apprehend right away what the issue is. And here, the record shows that they apprehended it quite correctly, and therefore, the stock went down. I was very instructive that my friend had cited the Omnicare case in the Sixth Circuit, which was a key premise of the District Court's case. When it came to omissions, the Omnicourt decision was overturned by the Supreme Court. The citation is 719F3R498, and the Supreme Court dealt with this issue of when there's an omission regarding regulatory violations, and they made it very clear, the Supreme Court Omnicare, said when you talk about your financial success, and when you talk about the source of your revenues, if you're not disclosing that the source of those revenues is as a result of illegal conduct, that creates a false statement. That creates an actionable omission. And so it was very important. It's very important that defendants are relying on this Omnicare Sixth Circuit. The District Court did. That's been overturned unambiguously. If you're putting the source of your revenues at play, and that source is false, is violations of Federal rules, you've got to disclose that. Certainly, you don't have to put it in play if you don't want to. And so that's key to the allegations here and key to our allegations. I think really we do come down to, first of all, I think it was important that we clarified that Paragraph 47 of the Keatam complaint, which is on the record, makes very clear this was a binary option. When you talk about the one-bar fusion, you could only make one entry. That entry is either going to be a Category 3 or it's going to be some other entry. Here they clearly persistently advocated to doctors, to care physicians and others, don't use a Category 3 because they stop earning money. And so once we have that as a premise that it's binary, there's only one option, the question really is, is does this pervasive scheme on its own amount to scienter against the individual defendants and ultimately the company, which the Court had dismissed the company from the action as well. And I think the Seventh Circuit in the Tell Labs on remand discusses this issue and the Ninth Circuit as well. The Second Circuit, when you're dealing with a pervasive scheme and the company is talking about, Category 3 is a big issue for us. We've got to make up the money from Category 3. We've got to change it. It won't cause such a big impact on the company. So obviously these individual defendants are very keyed into how are they going to earn money. How are they going to make money in the face of these headwinds? And actually there's a whole scheme now to derive substantial revenues by violating the False Claims Act. Is it a reasonable inference that the defendants did not know about this? If they're publishing a reimbursement guide, which per se violates the False Claims Act, is it a reasonable inference that the individual defendants didn't know? When you have your key surgeon, the key guy who shows how the surgeries are done, Dr. Tobler, and he's showing you how to do the surgery and he's billing it as a Category 1, is it reasonable that the individual defendants didn't know? That is really the question before this Court. You argued about that earlier. You've covered all that, I think. I think that's correct, Your Honor. Your red light came on. My red light came on, so let me bother the Court no longer and we'll rest. Thank you very much. Thank you. Appreciate it. And Mr. Humes, you're the anchorman here. Thank you, Your Honor. And I know I'm the lost causation guy, but I did want to just attempt to correct the record with that Omnicare case from the Sixth Circuit, the decision from 2009 that we cite. There, the Court was dealing with the Section 10 claims, just like you have here. I believe what Plaintiff's Counsel, Appellant's Counsel, is talking about is the Section 11 claims, which were circuit liability claims, which were also part of that case. Those went up on appeal to the Supreme Court, resulting in a decision there. So happy to submit supplemental authority or a shepherd's history, but I do think we needed to correct that. But back to lost causation. Plaintiff's Counsel referenced a Fifth Circuit case and a Ninth Circuit case, and I believe he's talking about the Amedesis case from the Fifth Circuit. I think that's factually distinguishable because there you had a Wall Street Journal article, a front page article that involved some pretty sophisticated economics and statistical analysis basically saying it looked like, based on Medicare records, Amedesis was abusing the Medicare system. You don't have that kind of analysis or fact finding here. That case also involved the Senate Finance Committee report, which basically found that Amedesis was abusing the system as well. Don't have that here. But the Ninth Circuit case is CBB Financial, which is fairly recent. But in that case, CBB Financial made statements that we're not aware of any of our borrowers being at risk of default. Well, that was directly contradicted by allegations that their main borrower, Garrett Group, the CEO of that company, told CBB that they're not going to be able to repay. So you have pretty good scienter allegations there. And the lost causation analysis, the court said, there was a government investigation, and that by itself may not be enough, but there was also, a month later, CBB wrote off nearly $100 million in that loan to Garrett. And it basically is an admission that they knew that Garrett couldn't repay the loans. So those two cases, you had adequate allegations of lost causation. They're just factually different and distinct from the case here. And so we would submit the plaintiff has not alleged adequate lost causation, in addition to failing to allege falsity and scienter. Thank you, Your Honors. Thank you very much, Mr. Humes. We'll come down and greet counsel and then take up our final case.
judges: Robert B. King, G. Steven Agee, Henry F. Floyd